## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALL STATES CONSTRUCTION, INC., and ALL STATES EMULSIONS LLC, | ) ) ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) **COMPLAINT** ) |
| PAUL ANTHONY GORMAN, ALBERT MARK GORMAN, GORMAN BROS., INC., THE CADY CO. INC., GORMAN ASPHALT, LTD., MOHAWK ASPHALT EMULSIONS, INC., GORMAN TERMINALS, LLC, and THE GORMAN GROUP, LLC, | ) Civil Action No.:   1:25-cv-156 (AMN/TWD) ) ) ) ) ) ) |
| *Defendants*. | ) ) |

## PRELIMINARY STATEMENT

This is an action for damages arising from defendants' breach of contract and fraud in the inducement with respect to their various material obligations to plaintiffs under the terms of a written Asset Purchase Agreement dated February 2, 2024 governing the sale of certain assets of defendants' asphalt business.

Plaintiffs seek recovery of all damages arising from defendants' breaches and misrepresentations as well as attorneys' fees and costs associated with bringing this action.

## THE PARTIES AND OTHER INTERESTED ENTITIES

1.    Plaintiff All States Construction, Inc. is a Massachusetts corporation with a principal place of business in West Springfield, Massachusetts.

2.    Plaintiff All States Emulsions, LLC (collectively with All States Construction, Inc., "All States") is a New York limited liability company whose sole member is ASA Holdings, LLC. ASA Holdings, LLC is a Massachusetts limited liability company whose sole member is All States Asphalt, Inc.  All States Asphalt, Inc. is a Massachusetts corporation with a principal place of

business in West Springfield, Massachusetts.

3.    All States is part of a 60+ year old family business founded in Western Massachusetts that initially focused on liquid asphalt product transportation and application.  Over time the family expanded its business into the production of asphalt emulsions and the operation of asphalt distribution terminals, as well as other areas relating to the supply of aggregates and hot mix pavement as well as bridge and road construction and rehabilitation.

4.    Defendant Gorman Bros., Inc. is a domestic business corporation organized and existing under the laws of the State of New York, with a principal place of business located at 200 Church Street, Albany, New York 12202.

5.    Defendant The Cady Co. Inc. is a domestic business corporation organized and existing under the laws of the State of New York, with a principal place of business located at 200 Church Street, Albany, New York 12202.

6.    Defendant Gorman Asphalt, Ltd. is a domestic business corporation organized and existing under the laws of the State of New York, with a principal place of business located at 200 Church Street, Albany, New York 12202.

7.    Defendant Mohawk Asphalt Emulsions, Inc. is a domestic business corporation organized and existing under the laws of the State of New York, with a principal place of business located at 200 Church Street, Albany, New York 12202.

8.    Defendant Gorman Terminals, LLC is a domestic limited liability company organized and existing under the laws of the State of New York, with a principal place of business located at 200 Church Street, Albany, New York 12202, and whose members are Albert M. Gorman, Paul A. Gorman, and two trusts, one of which is affiliated with each individual.  Upon information and belief, all four members are New York citizens.

-2-

9.      Defendant The Gorman Group, LLC is a domestic limited liability company organized and existing under the laws of the State of New York, with a principal place of business located at 200 Church Street, Albany, New York 12202, and whose members are Albert M. Gorman and Paul A. Gorman.  Upon information and belief, both members are New York citizens.

10.     Defendant Paul Anthony "Tony" Gorman is a natural person who, upon information and belief, resides in Loudonville, New York.

11.     Defendant Mark Gorman is a natural person who, upon information and belief, resides in Loudonville, NY.

12.     As used herein, "Gorman Group" refers collectively to the entities Gorman Bros., Inc., The Cady Co. Inc., Gorman Asphalt, Ltd., Mohawk Asphalt Emulsions, Inc., Gorman Terminals, LLC, and the Gorman Group, LLC.

13.     As used herein, "Defendants" refers collectively to the Gorman Group, Tony Gorman, and Mark Gorman.

14.     Peckham refers collectively to Peckham Asphalt Resale Corp., Peckham Materials Corp., and Peckham Rensselaer, LLC.  Peckham is part of a 100 year old family of companies that provides, *inter alia*, hot mix asphalt, warm mix asphalt, aggregates, and emulsions throughout the eastern New York State territories.

15.     Bitumar refers collectively to Bitumar, Inc. and its U.S. subsidiary, Bitumar USA Inc., which is focused on importing excess asphalt from Canada into the United States and, more particularly, into the northeast region of the United States.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that this is a civil action between citizens of Massachusetts and citizens of New York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) in that all defendants reside in this district and under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred here.

## FACTS COMMON TO ALL COUNTS

### Background

18.    During the relevant time period, the Gorman Group comprised a family of companies based in and around the Albany, New York area.  The Gorman Group's operations included one of the largest deep-water asphalt and rail facility terminals on the East Coast (located at the Port of Rensselaer, Riverside Avenue, in Rensselaer, New York) (the "Terminal"), an asphalt emulsion-manufacturing plant, transportation facilities, and pavement preservation services.

19.    Tony Gorman and Mark Gorman held a controlling interest in the Gorman Group as the principal shareholders, members, and/or equity holders.

20.    During the relevant time period, All States, the Gorman Group, Peckham, and Bitumar had certain overlapping operations that made them competitors in the heavily-contested liquid asphalt market in the northeast United States.

21.    Upon information and belief, prior to February 2, 2024, Bitumar had no meaningful presence in most of the New England/New York state region.  In particular, Bitumar had no presence in central or upstate New York, Vermont, and northern New Hampshire.

22.    Even in the limited areas in New York and New England where Bitumar did make sales, it had no operational presence.

23.    Asphalt (sometimes referred to as asphalt cement or asphalt binder) is a dark brown to black cementitious, viscoelastic (liquid) material derived mainly from a crude oil source through a distillation process.  Typically, the crude oil is refined and subjected to various separation

processes by large oil companies and refiners that, under the application of high heat, produce asphalt as a byproduct.  The asphalt is then purchased (at wholesale in large volumes) and enhanced by re-sellers such as the Plaintiffs to meet standardized specifications through a process of blending either with other asphalt streams or combined with water and chemicals in an emulsion plant to produce asphalt road emulsions, whereupon it is sold and distributed, in smaller volumes, to end users such as road-paving construction companies.

24.     Asphalt's strength and flexibility come from binding the liquid with rock and crushed gravel (known as "aggregate").  The finished product is used primarily for road paving in municipal, commercial, and residential applications as well as roofing-related and industrial coatings.

## **The Gorman Transaction**

25.     In or around 2022 and 2023, Tony Gorman and Mark Gorman sought to sell substantially all of the Gorman Group's assets.   All States, Peckham, and Bitumar, among others, were solicited by a Gorman-engaged business broker as potential purchasers.

26.     All States, Peckham, and Bitumar were invited to make offers to acquire some or all of Gorman's assets.

27.     All States was the successful initial bidder and entered into an exclusivity period in which All States attempted to reach a deal to acquire the entirety of the Gorman Group business activities.  This effort was ultimately not successful, and the Gorman Group once again reached out to other prospective bidders in mid-to-late 2023.

28.     While initially acting as competitive bidders against one another for the Gorman Group's business, All States and Peckham ultimately agreed to an arrangement whereby the two would collectively purchase the Gorman Group's assets.

29.     Throughout the relevant period, FMI Corp. ("FMI") served as the Gorman Group's authorized agent for the purpose of negotiating purchase terms with prospective buyers.

30.     Upon information and belief, FMI and individuals acting on its behalf were acting with actual and apparent authority to represent Defendants and communicate on their behalf to All States and Peckham with respect to all matters concerning the scope of the transaction, value and composition of the related assets, and price and terms of the sale of the Gorman Group assets.

31.     On November 21, 2023, Peckham (on behalf of itself and All States) signed a letter of intent (the "LOI") with the Gorman Group (as seller) under which Peckham and All States (and certain of their respective affiliates) expressed their intention to purchase collectively 100% of the Gorman Group's assets for $81 Million.  By its terms, the contents and subject matter of the LOI were confidential.

32.     Further, the parties to the LOI entered into mutual confidentiality agreements with Defendants under which each party was responsible for any disclosure of confidential information including by its employees.

33.     A material feature of the proposed transaction was the availability, for lease, of additional tank storage capacity in a neighboring facility owned by an unaffiliated third-party, Apex Oil Company ("Apex").  This corporate opportunity had previously been pursued by Gorman executives who made clear that the opportunity would be transferred to the buyer of the Terminal upon closing.  The negotiated valuation of the transaction, as agreed in the LOI, fully reflected these representations.

34.     Under the LOI, the Gorman Group agreed that for a defined period beginning on November 21, 2023, it would not enter into any new discussions and would discontinue any existing discussions or negotiations with any third party (which would have included Bitumar)

relating to a "competing" transaction, *i.e.*, one that involved the sale of the company's material assets. The LOI further memorialized the parties' intent to negotiate and execute definitive agreements with respect to the proposed asset sale to Peckham and All States.

35.    As contemplated by the parties in the LOI, Peckham and All States proceeded to negotiate and enter into separate, parallel asset purchase agreements with the Defendants (each an "APA" and together the "APAs").  The APA was a "sign and close" transaction, meaning the closing occurred on the day the APA was executed, on or about February 2, 2024 (the "Closing Date").

36.    Under these respective agreements, Peckham acquired certain assets including, but not limited to: (i) the deep water liquid asphalt Terminal on the Hudson River in Rensselaer, New York that houses intakes and stores a wide variety of asphalt and asphalt additives in large storage tanks; (ii) a wholesale business that blends, tests, and sells liquid asphalt cement to third-party construction companies; and (iii) accounts receivable, inventory, intellectual property, contracts, and certain Books and Records (as defined under the APA) (referred to herein as the "Terminal Assets").

37.    For its part, All States acquired particular assets relating to the Gorman Group's emulsions business and its highway construction & maintenance business, including (for both businesses) certain accounts receivable, inventory, intellectual property, contracts, real estate, and certain Books and Records (referred to herein as the "Emulsion & Construction Assets").

38.    Together, Peckham and All States acquired all of Gorman's assets, good will, and corporate opportunities.

39.    The various representations and warranties made by Defendants as part of the APA were critical not only to the operation of the assets All States purchased but more generally to Plaintiffs' ongoing, individual businesses in their existing territories, which they were seeking to

enhance, as well as their strategic plans to expand their respective businesses in the former Gorman Group territories.

## **The Cenex Tanks**

40.    As noted above, part of the Gorman Group's assets included the Terminal—a deep water asphalt terminal facility at the Port of Rensselaer, with asphalt storage tanks capable of holding approximately 80,000 tons of liquid asphalt.

41.    The Terminal is strategically located, is accessible by both rail and water, and is a main hub for asphalt supply in Upstate New York and Western Massachusetts.

42.    The Gorman Group, however, was not the only entity with operations at the Port of Rensselaer.

43.    A third-party known as CHS, Inc./Cenex ("Cenex") owns additional storage tanks on the property sitting adjacent to the Gorman Group's tanks.

44.    Upon information and belief, prior to the Closing Date of February 2024, the Cenex tanks were not being used for liquid asphalt, were not configured for use with liquid asphalt, and were unleased.

45.    For years prior to the sale of Gorman Group's assets, Defendants recognized the strategic and competitive value the Cenex tanks would add to the Gorman Group enterprise, and considered leasing them and (together with the lessor) making the necessary financial investments to reconfigure them for use with liquid asphalt.

46.    Upon information and belief, the Cenex tanks are capable of holding approximately 30,000 tons of liquid asphalt.

47.    Acquiring control over the Cenex tanks was an attractive proposition for Defendants, because the tanks would have increased the Gorman Group's capacity for liquid asphalt storage by approximately 38%.

48.    In addition, Defendants knew that holding control over the tanks would make them unavailable to competitors, thereby securing a market advantage the Gorman Group already enjoyed.

49.    The Capital Region of New York, which is the general region most directly served by the Gorman Group's terminal, is known and recognized in the asphalt industry as one of the, if not the, most competitive regions in the entire United States for the sale and distribution of wholesale liquid asphalt.

50.    Accordingly, upon information and belief, Defendants actively tried to lease the Cenex tanks in the months (and perhaps even years) prior to executing the LOI with All States and Peckham.

51.    Upon information and belief, Defendants engaged in negotiations with Cenex and discussed the material terms of a lease for the Cenex tanks.

52.    Upon information and belief, the Gorman Group never finalized the lease terms with Cenex but advised both All States and Peckham that the Cenex tanks were an open opportunity.

**Defendants Breached their Contractual Representations and Warranties**

53.    At all relevant times, the APA was a valid and binding agreement that existed between All States and Defendants.

54.    Under Section 4.06 of the APA, the Defendants made the following express representation and warranty:  "there has not been any . . . (a) event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect . . . ."

55.    The APA defines "Material Adverse Effect" as an "event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Sellers to consummate the transactions contemplated hereby on a timely basis . . . ."

56.    Under Section 4.25 of the APA, the Defendants made the following express representation and warranty:  "There is no fact known to any Seller regarding any Seller or the Business (other than general economic or industry conditions) that materially adversely affects or threatens either of the Business, the Purchased Assets, or the prospects, financial condition, or results of operations of the Business . . . ."

57.    At the time the APA was executed in February 2024, Defendants knew or had reason to believe that Bitumar was entering the regional liquid asphalt market and planned to lease or acquire the Cenex tanks located next to Gorman's terminal.

58.    In light of the attendant circumstances and what Gorman knew at the time, this significant development was plainly one that "could reasonably be expected to become . . . materially adverse to . . . the value of the Purchased Assets." (*See* APA Section 4.06 and *definitions.*)  As such, Gorman's representation and warranty that as of the Closing Date no such event had occurred was false.  Equally false for similar reasons is Gorman's related representation and warranty that as of the Closing Date it knew of no fact regarding the business "that materially adversely affects or threatens . . . the Purchased Assets." (APA Section 4.25.)

## Defendants' False Representations About the Cenex Tanks

59.    Both before and after execution of the LOI, Defendants represented that the Cenex tanks would be available for lease post-closing.

60.     As subsequent events would demonstrate, these representations were false.

61.     In the fall of 2023, FMI provided information to All States on Defendants' behalf regarding the value of the Gorman Group assets with the intent that All States rely on that information.

62.     FMI and Defendants knew that All States would rely on those representations when assessing whether to purchase the Gorman Group's assets, and the value of those assets.

63.     FMI, on behalf of Defendants, repeatedly touted both the availability of the Cenex tanks and the ability to preclude the introduction of new competition at the Port of Rensselaer by leasing the Cenex Tanks as a "value add" growth opportunity related to the Gorman Group's assets.

64.     Those representations were intended to, and did, cause All States to ascribe significantly more value to—and ultimately to pay more for—the Gorman Group's assets than All States would have otherwise.

65.     All States justifiably relied upon those representations.

66.     Defendants knew that All States would not have consummated the sale, or would have dramatically reduced its offer price, if All States had learned that a major regional competitor was actively seeking to lease the Cenex tanks.

67.     The ability to preclude any competitors from using the Cenex tanks was a material consideration for All States and Peckham, and Defendants knew it was a material consideration.

68.     As long time participants in the region's liquid asphalt market, Defendants knew that if the Cenex tanks were to fall into the hands of a competitor, it would materially decrease the value of the Gorman Group's assets.

**Defendants Knew the Cenex Tanks Were Not Available**

69.     Despite representations to the contrary, and unbeknownst to All States and Peckham, the Cenex tanks were not actually available.

70.     Defendants knew, prior to the Closing Date, that Bitumar had taken steps to lease or acquire the Cenex tanks.

71.     As mentioned above, Bitumar was once a potential buyer/bidder for the Gorman Group's assets.  Having been unsuccessful in its bid, it is believed Bitumar shifted and focused instead on leasing the Cenex tanks.

72.     On March 1, 2024 (one month after All States and Peckham consummated the purchase of the Gorman Group's assets), Bitumar publicly announced that it was entering the asphalt market through its "new location" in Port Rensselaer, New York (the location of the Cenex tanks). The letter announced that three members of the Gorman Group's management team, including Edward House, Ben Scarcella, and Kimberly Wilson, would lead Bitumar's sales team in the new location.

**Gorman Group's Management Knew About Bitumar's Plans**

73.     As mentioned above, Defendants invited All States and Peckham to bid on the Gorman Group's assets in September 2023.   An LOI was executed on November 21, 2023, and the Closing Date was February 2, 2024.

74.     Three members of Gorman Group's management team laid plans to join Bitumar months prior to the Closing Date, including Mr. House, Mr. Scarcella, and Ms. Wilson.

75.     Emails and Outlook appointments obtained by All States establish that those three individuals were in direct communication with Bitumar's senior leadership concerning their employment at Bitumar's planned new location at the Port of Rensselaer.

76.     As the Closing date approached, the frequency of Defendants' discussions with Bitumar increased.  On December 11th, 14th, and 22nd 2023, Edward House, Ben Scarcella, Kimberly Wilson attended a series of virtual meetings with Bitumar executives.

77.     Upon information and belief, those discussions included Bitumar's planned entry into the liquid asphalt market of the Northeastern United States.

78.     Upon information and belief, those same Gorman Group employees were aware that Bitumar was planning to acquire control over the Cenex tanks and thereby gain a massive foothold in the regional market.

79.     As officers and managers of the Gorman Group, the information known by Edward House, Ben Scarcella, and Kimberly Wilson was imputed to the Gorman Group.

80.     Upon information and belief, those same individuals knew that Defendants had made material misrepresentations to All States and Peckham concerning the availability of the Cenex tanks and the "value add" opportunity to preclude any competitors from using the Cenex tanks.

81.     Tony Gorman and Mark Gorman also knew that Cenex was planning to lease the Cenex tanks to Bitumar.

82.     On November 10, 2023, Tony Gorman received an email from John Cawthorn (Vice President at the Gorman Group) confirming a discussion Mr. Cawthorn had with Cenex.    In that discussion, Mr. Cawthorn learned that the Cenex tanks were "off the table" because Cenex was engaged in negotiations with a third party.

83.     Thus, by at least November 10, 2023, Defendants knew or should have known not only that the Cenex tanks would not be available but that a major regional competitor would be entering the local asphalt market.

84.     Defendants never disclosed the information they had about Bitumar's planned entry into the regional market by leasing the Cenex tanks despite having a contractual obligation to do so.

85.     Bitumar had no sales presence in most of central and upstate New York, Vermont, northern New Hampshire, and Connecticut until it hired the three former members of the Gorman Group's management team.

86.     It was only after hiring those members of the Gorman Group's management team, and with the execution of a lease of the neighboring Apex tank storage, that Bitumar was able to break into these new markets.

**All States Notified Defendants of its Direct Claims**

87.     Pursuant to APA section 7.02, Defendants agreed to indemnify All States for any Loss (as defined in the APA) incurred based on "any inaccuracy in or breach of any of the representations or warranties" by the Defendants.

88.     On November 15, 2024, All States provided Defendants with formal written notice under the APA of its intent to invoke and pursue a claim pursuant to Section 7.02 of the APA.

89.     Specifically, All States thereby gave notice under APA Section 7.05(c) of a "Direct Claim" based on Defendants' breach of at least two representations and warranties under the APA.

90.     *First*, All States notified Defendants that that they were in breach of APA Section 4.06, in which Defendants made a series of representations and warranties with respect to "the [a]bsence of [c]ertain [c]hanges, [e]vents and [c]onditions" including, in subsection (a), that "there has not been any . . . Event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect . . . ."

91.     *Second*, All States notified Defendants that there were in breach of APA Section 4.25, in which Defendants made the representation and warranty that "[t]here is no fact known to

any Seller regarding . . . the Business . . . that materially adversely affects or threatens either of the Business, [or] the Purchased Assets . . . ."

92.    All States further informed Defendants that, in light of the above allegations, it is apparent that by no later than November 10, 2023, Defendants knew that an All States competitor (*i.e.*, Bitumar) was likely to enter the market via the lease or purchase of storage tanks at the Port of Rensselaer, NY owned and/or operated by Cenex.  Gorman also knew that the entry of that competitor into the market would significantly reduce the value of the transaction and Purchased Assets to All States.

93.    The parties placed $4 million into an "Escrow Indemnification Fund."  Pursuant to APA Section 7.06(c), if All States identifies a Direct Claim that is not fully resolved by February 2, 2025, All States is be entitled to "retain the portion of the remaining Indemnification Escrow Amount equal to the anticipated Loss for such claim" until the claim is fully resolved.

94.    Under the terms of the APA, however, and in light of the nature of the claims asserted here, All States's recovery is not limited to the amount of the Escrow Indemnification Fund.  *See* APA Section 7.09 (providing that otherwise exclusive remedies do not apply to allegations of fraudulent or intentional misconduct).

95.    While the quantum of Loss sustained by the Buyer as a result of Sellers' breach is not yet fully known, it is significant and will, at minimum, greatly exceed the amount of the Indemnification Escrow Amount under the APA (*i.e.*, $4 million).  Plaintiffs expect to be able to demonstrate that consideration of the information withheld by Defendants in breach of the APA would have reduced the value Buyer Plaintiffs placed on the Purchased Assets to a small fraction of the Purchase Price.

96.     At part of the Notice Letter, All States also provided formal notice of intent to exercise their right under APA Section 7.06(c) to "retain the portion of the remaining Indemnification Escrow Amount equal to the anticipated Loss for such claim" until the claim is fully resolved.

97.     Defendants responded to the Notice Letter on November 22, 2024. While that response misstated the factual basis of Buyer's Plaintiffs' notice of Direct Claim, it essentially admitted that Defendants' conduct constitutes an actionable breach of its representations and warranties under the APA.

98.     To wit, Defendants' response stated that "all of the parties clearly understood that the [Cenex storage tanks] . . . were or could be used for asphalt storage; and that if they were not used by one of the parties to the APA they could potentially be used, or even acquired by a third party." Defendants' response omitted, however, the essential fact that prior to execution of the November 20, 2023 Letter of Intent, the Gorman Group was aware that the Cenex tanks already had been locked up by a third party and, therefore, were *not* available to Buyer.

99.     Defendants were also aware that this is precisely the type of "change that… could reasonably be expected to become…materially adverse to …the value of the Purchased Assets" under the APA's definition of a "Material Adverse Effect."

100.    In light of Defendants' rejection of All State's demand, Plaintiffs are free to pursue all remedies made available under the APA including the pursuit of this lawsuit.

## CAUSES OF ACTION

### COUNT I
**(Breach of Contract -- False Representation)**

101.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

102.    Under Section 4.25 of the APA, the Defendants made the following express representation and warranty:  "There is no fact known to any Seller regarding any Seller or the Business (other than general economic or industry conditions) that materially adversely affects or threatens either of the Business, the Purchased Assets, or the prospects, financial condition, or results of operations of the Business . . . ."

103.    At all times herein mentioned and relevant, the APA was a valid and binding agreement that existed between All States and Defendants.

104.    At the time the APA was executed in February 2024, Defendants knew or had reason to believe that Bitumar was entering the regional liquid asphalt market and planned to lease or acquire the Cenex tanks located next to Gorman's terminal.

105.    The actions and knowledge of Edward House, Ben Scarcella, and Kim Wilson, as officers and/or managers of the Gorman Group, are imputed onto the Gorman Group.

106.    Tony Gorman knew at least by November 10, 2023, that the Cenex tanks were "off the table" because Cenex was engaged in negotiations with a third party.

107.    Defendants failed to disclose those material adverse facts to All States prior to the Closing Date.

108.    Those facts were materially adverse to the Gorman Group's business and assets because:

      a.    Bitumar is a competitor in an already extremely competitive market;

b.   The Gorman Group's assets were not as valuable to All States if the Cenex tanks were being acquired by a major new competitor;

c.

d.   All States would not have consummated the purchase of Gorman Group's assets or would not have done so for the same price, had they known that the Cenex tanks were leased to Bitumar; and

e.   The Gorman Group's business and assets were materially devalued by the introduction of a competitor at the adjacent terminal.

109.   By falsely representing that they were unaware of any fact materially adversely affecting or threatening the Gorman Group's business or the assets acquired by Plaintiffs, Defendants breached section 4.25 of the APA.

110.   As a result of Defendants' breach of the APA, Defendants are liable to Plaintiffs for damages, including, without limitation, the decrease in value of the Gorman Group's assets that All States purchased and the value of lost business opportunities in an amount yet to be determined.

## <u>COUNT II</u>
### (Breach of Contract – Failure to Disclose)

111.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

112.   Pursuant to the APA, Defendants assumed a duty to disclose any state of facts that could be expected to have a material effect on the value of the acquired assets.

113.   Specifically, Section 4.06 of the APA states: "Since the Balance Sheet Date, the Business has been conducted in the ordinary course of business consistent with past practice, and there has not been any: (a) Event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect."

114.    A "Material Adverse Effect" is defined in the APA as:  "any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Sellers to consummate the transactions contemplated hereby on a timely basis . . . ."

115.    As set forth above, Defendants breached its representations under the APA by failing to disclose the following material adverse facts: (1) the Cenex tanks would not be available to All States and/or Peckham post-closing; (2) Bitumar, a competitor, would hold control over the Cenex tanks; and (3) Bitumar was entering the regional liquid asphalt market through tanks situated next door to the Gorman Group's assets.

116.    As a result of Defendants' breach of the APA, Defendants are liable to Plaintiffs for damages, including, without limitation, the decrease in value of the Gorman Group's assets that All States purchased and the value of lost business opportunities in an amount yet to be determined.

## COUNT III
### (Fraud in the Inducement)

117.    Plaintiffs reallege, repeat, and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth in this paragraph.

118.    As alleged above, Defendants made repeated representations to All States leading up to the Closing Date that the Cenex tanks were a corporate opportunity available to All States and/or Peckham.

119.    The Cenex tanks were touted by Defendants as a "value add" to Plaintiffs.

120.    Those representations were knowingly false when made.

121.    Defendants made those representations for the purpose of inducing All States and Peckham to over-pay for the Gorman Group's assets and to induce the ultimate purchase of the assets.

122.    All States reasonably and justifiably relied on Defendants' representations.

123.    All States would not have valued Defendants' assets as high as they did if Defendants had not materially misrepresented that the Cenex tanks would be available.

124.    After the Closing Date, Plaintiffs learned that the Cenex tanks would not be available because Bitumar had already purchased and/or leased them.

125.    Bitumar's purchase and/or lease of the Cenex Tanks had a significant negative effect on the value of the Gorman Group's assets because Bitumar, a competitor, was afforded access to the market by leasing those tanks.

126.    The acquisition of the Cenex tanks by Bitumar has dramatically reduced the value of the purchased assets to All States.

127.    Defendants' misrepresentations constitute a fraud for which they are liable.

128.    As a result of Defendants' fraud in the inducement, Defendants are liable to Plaintiffs for damages, including, without limitation, the decrease in value of the Gorman Group's assets that All States purchased and the value of lost business opportunities in an amount yet to be determined.

129.    Further, in light of Defendants' fraudulent, willful and intentional conduct, punitive damages are warranted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment as follows:

1. Compensatory damages against Defendants;

2. Exemplary, punitive, and/or multiple damages against Defendants to the extent permitted by law;

3. Attorneys' fees and costs to the extent permitted by contract and/or law;

4. Costs;

5. Pre-judgment and post-judgment interest and;

6. Such other and further relief as this Court deems just and proper.


Respectfully submitted,

**ALL STATES CONSTRUCTION, INC.
and ALL STATES EMULSIONS, LLC,**

By their attorneys,

*/s/ Jonathan I. Handler*
Jonathan I. Handler
jihandler@daypitney.com
William D. Black
wblack@daypitney.com
DAY PITNEY LLP
One Federal Street, 29th Floor
Boston, MA 02110
Telephone: (617) 345-4600

Dated:  February 3, 2025