UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ALL STATES CONSTRUCTION, INC. and ALL STATES
EMULSION, LLC,

                             Plaintiffs,

-against-                                          1:25-CV-156 (LEK/CBF)

PAUL ANTHONY GORMAN, *et al.*

                             Defendants.

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

On February 3, 2025, Plaintiffs All States Construction, Inc. and All States Emulsions LLC ("Plaintiffs" or "All States") commenced this action against Defendants Paul Anthony Gorman, Albert Mark Gorman, The Cady Co. Inc., Gorman Asphalt, LTD., Mohawk Asphalt Emulsions, Inc., Gorman Terminals LLC, and the Gorman Group, LLC ("Defendants"), for breach of contract and fraudulent inducement. Dkt. No. 1 ("Complaint"). On April 11, 2025, Plaintiffs filed an Amended Complaint against the Gorman Defendants, adding a fourth claim, that the Defendants had failed to perform a contractual term that had been added through a modification. Dkt. No. 25 ("Amended Complaint").

On April 29, 2025, Defendants filed a Motion to Dismiss. Dkt No. 33 ("Motion"). On June 20, 2025, Plaintiffs filed a Response in Opposition, Dkt. No. 41 ("Response"), and on July 11, 2025, Defendants replied. Dkt No. 44 ("Reply").

For the reasons stated below, the Court partially grants and partially denies Defendants' Motion to Dismiss.

## II.    BACKGROUND

The following facts are set forth as alleged in the Amended Complaint. The Court

assumes the Parties familiarity with the terms of the Asset Purchase Agreement ("APA"). Dkt.

No. 34-2 ("Asset Purchase Agreement").[1]

Plaintiff All States "is part of a 60+ year old family business . . . [involved in] the

production of asphalt emulsions and the operation of asphalt distribution terminals." Am. Compl.

¶ 3. At the times relevant to this lawsuit, the Gorman Group "comprised a family of companies

based in and around the Albany, New York area." *Id.* ¶ 18. "The Gorman Group's operations

included one of the largest deep-water asphalt and rail facility terminal on the East Coast. . . an

asphalt emulsion-manufacturing plant, transportation facilities, and payment preservation

services." *Id.* Defendants "Tony Gorman and Mark Gorman held a controlling interest in the

Gorman Group as the principal shareholders, members, and/or equity holders." *Id.* ¶ 19.

During the time period preceding the signing of the APA, "All States, the Gorman Group,

Peckham, and Bitumar, had. . . overlapping operations that made them competitors in the

heavily-contested liquid asphalt market in the northeast United States." *Id.* ¶ 20.

### A.  February 2024 Transaction

"In or around 2022 or 2023, Tony Gorman and Mark Gorman sought to sell substantially

all of the Gorman Group's assets. All States, Peckham, Bitumar, among others were solicited . . .

as potential purchasers." *Id.* ¶ 25. "All States, Peckham, and Bitumar, were invited to make

---

[1] The Court is permitted to consider the terms of the APA as Plaintiffs heavily relied
upon its terms in crafting their Complaint. *See generally* Compl.; *see also Revitalizing Auto
Communities Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 436 (2d Cir. 2024) (noting
that at a court can consider a document if the "complaint 'relies heavily upon its terms and
effect,' rendering the document 'integral' to the complaint.'") (quoting *Mangiafico v.
Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

offers [at that time] to acquire some or all of Gorman's assets." *Id.* ¶ 26. "All States was the successful initial bidder, and entered into an exclusivity period . . . to reach a deal to acquire the entirety of the Gorman Group." *Id.* ¶ 27. All States failed to reach a deal with the Gorman Group, and accordingly, the Gorman Group "reached out to other prospective bidders in mid-to late 2023." *Id.* ¶¶ 27.

In 2023, "All States and Peckham. . . agreed to an arrangement whereby the two would collectively purchase the Gorman Group's assets." *Id.* ¶ 28. "FMI Corp. ('FMI') served as the Gorman Group's authorized agent for the purposes of negotiating purchase terms with prospective buyers." *Id.* ¶ 29. FMI had "actual and apparent authority to represent Defendants and communicate on their behalf to All States and Peckham with respect to all matters concerning the scope of the transaction, value and composition of the related assets, and price and terms of the sale of the Gorman Group assets." *Id.* ¶ 30.

"On November 21, 2023, Peckham (on behalf of itself and All States) signed a letter of intent (the 'LOI') with the Gorman Group (as seller), under which Peckham and All States . . . expressed their intention to purchase collectively 100% of the Gorman Group's assets for $81 Million." *Id.* ¶ 31. The LOI included a confidentiality agreement. *Id.* ¶¶ 31–32.

"A material feature of the proposed transaction was the availability, for lease, of additional tank storage capacity in a neighboring facility owned by an unaffiliated third-party Apex Oil Company ('Apex'). This corporate opportunity had previously been pursued by Gorman executives who made clear the opportunity would be transferred to the buyer of the Terminal upon closing." *Id.* ¶ 33.

"Under the LOI, the Gorman Group agreed that for a defined period beginning on November 21, 2023, it would not enter into any new discussions and would discontinue any existing discussions . . . relating to a 'competing' transaction." *Id.* ¶ 34.

"Peckham and All States proceeded to negotiate and enter into separate, parallel asset purchase agreements ('APA') with the Defendants." *Id.* ¶ 35. The APAs were "sign and close transactions. . . [such that] the closing occurred on the day the APA was executed, on or about February 2, 2024." *Id.* ¶ 35.

"Together, Peckham, and All States acquired all of Gorman's assets, good will, and corporate opportunities." *Id.* ¶ 38.

### B.  Cenex Tanks

At the Port of Rensselaer water asphalt terminal facility, "[a] third-party known as CHS, Inc./Cenex ('Cenex') owns additional storage tanks on the property sitting adjacent to the Gorman Group's tanks." *Id.* ¶ 40–43. "[P]rior to the Closing Date. . . the Cenex tanks were not being used for liquid asphalt, were not configured for use with liquid asphalt, and were unleased." *Id.* ¶ 44.

"[P]rior to the sale of Gorman Groups' assets . . . [Defendants] considered leasing [the Cenex tanks] and . . . making the necessary financial investments to reconfigure them for use with liquid asphalt." *Id.* ¶ 45. "[T]he Gorman Group never finalized the lease terms with Cenex but advised both All States and Peckham that the Cenex tanks were an open opportunity." *Id.* ¶ 52.

"Both before and after execution of the LOI, Defendants represented that the Cenex tanks would be available for lease post-closing." *Id.* ¶ 59. "FMI, on behalf of Defendants, repeatedly touted both the availability of the Cenex tanks and the ability to preclude the introduction of new

4

competition at the Port of Rensselaer by leasing the Cenex Tanks as a 'value add' growth opportunity related to the Gorman Group's assets." *Id.* ¶ 63.

These representations "cause[d] All States to ascribe significantly more value to—and ultimately to pay more for—the Gorman Group's assets than All States would have otherwise." *Id.* ¶ 64. However, "Defendants knew, prior to the Closing Date, that Bitumar had taken steps to lease or acquire the Cenex tanks." *Id.* ¶ 70.

"On March 1, 2024 . . . Bitumar publicly announced that it was entering the asphalt market through its 'new location' in Port Rensselaer, New York." *Id.* ¶ 72. The announcement also noted that "three members of the Gorman Group's management team including Edward House, Ben Scarcella, and Kimberly Wilson, would lead Bitumar's sales team in the new location." *Id.* These three individuals "were in direct communication with Bitumar's senior leadership concerning their employment at Bitumar's planned new location" prior to the closing date. *Id.* ¶ 74–75. "Tony Gorman and Mark Gorman also knew that Cenex was planning to lease the Cenex tanks to Bitumar." *Id.* ¶ 81–82.

### C. Drum Removal

"On January 30, 2024, All State representatives conducted a pre-closing inventory at the Mohawk Asphalt Emulsions facility. . . . During that inventory, the All States representatives observed the presence of a large quantity of drums, totes, and related materials that Gorman had kept in the Northern Storage area of the property ('Mohawk Drums') that were not among the assets All States intended to purchase." *Id.* ¶ 101.

"Tony Gorman agreed on behalf of Defendants to arrange and be responsible for the cost of removing the Mohawk Drums. Mr. Gorman confirmed that obligation via text message with

All States." *Id.* ¶ 102. "On May 9, 2024, Defendants' legal counsel for the transaction re-confirmed Defendants' agreement to pay for the removal of the Mohawk Drums." *Id.* ¶ 103.

Defendants only paid for the removal of some of the Mohawk Drums, and Plaintiffs were thus "required to engage [a contractor] to complete the removal of the Mohawk Drums at a total cost of $230,018.40." *Id.* ¶¶ 104–106.

## III.    LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. *See Allaire Corp. v.Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Id.* at 556.

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Supreme Court has stated that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. *Id.* at 679.

6

## IV.   DISCUSSION

Defendants in support of their Motion make three principal arguments: (1) Defendants did not breach the Material Adverse Effect provisions of the contract;[2] (2) Defendants did not fraudulently induce Plaintiffs to enter into the contract; and (3) Defendants did not agree to modify the contract. Mot. at 15–32. The Court will address these arguments below.

### A.  Material Adverse Effect

Defendants first argue that they did not breach the APA's Material Adverse Effect ("MAE") provisions, by failing to disclose the entrance of Bitumar into the northeast liquid asphalt market. Mot. at 19–23. They make three points to support this argument: (1) that the APAs Merger Clause limits the scope of the MAE provisions to events that were not foreseeable at the time of the transaction; (2) Plaintiffs were required to perform due diligence in order to succeed in their breach of warranty claims; and (3) the MAE provisions were limited to events related to the conduct of the purchased business. *Id.*;Reply at 6–8.

---

[2] The Court acknowledges Defendants' argument that the Merger Clause forecloses the Court's consideration of Plaintiffs' breach of contract claims. Mot. at 15–18. However, as Plaintiffs claims involve the alleged breach of express warranties, and a Merger Clause does not bar claims involving express warranties the Court will continue to assess Plaintiffs' claims. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) (noting that an express warranty is "part and parcel of the contract containing it and an action for its breach is grounded in contract."); *Morgan Stanley High Yield Securities Inc. v. Seven Circles Gaming Corp.*, 269 F. Supp. 2d 206, 213 ("[T]he parol evidence rule. . . bar[s] the introduction of evidence pertaining to terms in a prior oral agreement that would vary the terms of a written contract."); *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000) (noting that the parol evidence rule applies to integrated contracts, such as those containing merger clauses).

### 1. Merger Clause

First, Defendants argue that they did not breach the APA's MAE provisions, because the MAE provisions are limited in scope by the parties' express disclamation of reliance on extra-contractual representations in Section 8.06 ("Merger Clause"). Reply at 8. The Court disagrees.

"MAE provisions are 'a common feature of many contracts and are subject to the same rules of interpretation as any other contract provision.'" *Newmont Mining Corp. v. AngloGold Ashanti Ltd.*, 612 F. Supp. 3d 223, 245 (S.D.N.Y. 2020) (quoting *In re Lyondell Chem. Co.*, 567 B.R. 55, 122 (Bankr. S.D.N.Y. 2017), *aff'd,* 585 B.R. 41 (S.D.N.Y. 2018). Thus, an MAE provision "must be analyzed in the context of the [APA] as a whole and construed in accordance with the parties' intent. "*Newmont Mining Corp.*, 612 F. Supp. 3d at 246.

In cases where a buyer has expressly disclaimed reliance on any extra-contractual representations, courts in New York and in this Circuit have narrowly construed the scope of MAE provisions. *Id.* (citing *In re Lyondell Chemical Co.*, 567 B.R. at 123; *in re JC's East, Inc.*, No. 95 Civ. 1870 (MGC), 1995 WL 555765, at *3 (S.D.N.Y. Sept. 19, 1995), *aff'd*, 84 F.3d 527 (2d Cir. 1996); *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 68 (Del. Ch. 2001)). MAE provisions in these cases are limited in scope to events "that were outside the contemplation of the parties at the time of the transaction," and were "outside [the buyer's] control." *In re JC's East, Inc.*, 1995 WL 555765, at *3; *see also Newmont Mining Corp.*, 612 F. Supp. 3d at 246; *In re Lyondell Chemical Co.*, 567 B.R. at 123.

In Section 8.06, the parties expressly disclaimed reliance on any representations, warranties, conditions, understandings, or agreements unless contained within the four corners of the contract. *See* APA § 8.06. Therefore, the scope of the MAE provision is limited in this case

to events that were both outside the contemplation of the parties when they entered into the agreement and outside of the buyer's control. *See in re JC's East, Inc.*, 1995 WL 555765, at *3.

Plaintiffs alleged in their Complaint that "[a]t the time the APA was executed in February 2024, Defendants knew or had reason to believe that Bitumar was entering the regional liquid asphalt market and planned to lease or acquire the Cenex Tanks located next to Gorman's terminal." Am. Compl. ¶ 57. The entrance of a competitor into the regional local asphalt market is definitionally an event that is outside of the control of the buyer. Further, none of the allegations contained in Plaintiffs' Amended Complaint support the conclusion that the entrance of Bitumar was contemplated when the parties entered into the agreement. *See generally* Am.

Therefore, the Court does not find that Section 8.06 forecloses Plaintiffs' arguments that Defendants' failure to disclose the entrance of Bitumar breached the APA's MAE provisions. Accordingly, the Court will continue to assess Defendants other arguments relating to the MAE provisions.

### 2. *Material Adverse Effect and Due Diligence*

Defendants' second argument regarding the breach of the APA's MAE provisions, is that Plaintiffs were required to engage in due diligence and were not permitted to rely on the express warranties contained in the contract. Mot. at 24–28. The Court disagrees.

Under New York Law,

> "[a] warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946).

9

Accordingly, the Court finds this argument unavailing, and will continue to assess Defendants' arguments that the text of the MAE provisions forecloses Plaintiffs' preferred interpretation of the APA.

### 3. Material Adverse Effect Provisions

Finally, Defendants argue that they didn't breach the MAE provisions of the APA, because those provisions are limited to events related to the Business itself. Mot. 19–28. The Court disagrees for the reasons stated below.

In New York, "the initial interpretation of a contract is a matter of law for the Court to decide." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 85 (2d Cir. 1998) (quoting *K. Bell & Assoc., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996)). "If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." *Id.*

In New York, a successful "breach of express warranty claim[] requires (i) a *material statement* amounting to a warranty; (ii) the buyers *reliance* on this warranty as a basis for the contract with his immediate seller; (iii) the *breach* of this warranty; and (iv) injury to the buyer *caused* by the breach." *Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013) (citing *CBS Inc. v. Ziff- Davis Pub. Co.*, 553 N.E.2d 997, 1000–01 (N.Y. 1990) (emphasis in original)). "[I]f the seller is not the source of the buyer's knowledge . . . if it is merely 'common knowledge' that the facts warranted are false, or the buyer has been informed of the falsity of the facts by some third party, the buyer may prevail in his claim for breach of warranty." *Rogath v. Siebenmann*, 129 F.3d 261, 265 (2d Cir. 1997).

Here, Defendants argue that they did not breach Sections 4.06 or 4.25 of the APA when they failed to disclose that the Cenex Tanks were no longer available, and that a potential competitor was entering the market. Mot. at 19–23.

Starting with Section 4.06, the APA states in relevant part that: "[s]ince the Balance Sheet Date . . . there has not been any (a) event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse effect." Asset Purchase Agreement § 4.06. A "Material Adverse Effect" is further defined as "any event, occurrence, fact, condition or change that is, or could reasonably be expected to become materially adverse . . . to the value of the Purchased Asset." *Id.* Art. I.

Defendants cherry-pick language from the preamble to Section 4.06 that states that "[s]ince the Balance Sheet Date, the Business has been conducted in the ordinary course of business." Asset Purchase Agreement § 4.06; Mot. at 19–23. They suggest that this language means that all of the representations that follow are limited to the Business itself, and not any extrinsic events or actions of third parties. *See* Mot. at 19–23. Plaintiffs counter arguing that a "Material Adverse Effect", by its very terms, includes the entry of a competitor into the northeast asphalt market. Resp. 13–15.

The Court agrees with Plaintiffs. The plain text of Section 4.06, when read in conjunction with the APA's definition of a material adverse effect, unambiguously goes beyond the operations of the business. Indeed, Section 4.06 expressly refers an "event, occurrence, or development" which clearly encompasses the acts of a third party that have a material adverse effect on the value of the purchased asset. *See* Asset Purchase Agreement § 4.06; Occurrence, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/occurrence (last visited Mar. 31, 2026). Thus, Plaintiffs' allegations that Defendants violated the APA when they failed to

disclose the fact that a new competitor was entering the market for the first time, plausibly states a claim, and dismissal is not warranted.

Next, Section 4.25 states in relevant part that "[t]here is no fact known to any Seller regarding any Seller or the Business . . . that materially adversely effects or threatens either the Business, the Purchased Assets, or the prospects, financial condition, or results of operations of the Business that has not been set forth in this Agreement or a related Schedule." Asset Purchase Agreement § 4.25. Defendants once again urge the Court to focus on the word "Business" to the exclusion of other terms and phrases contained in Section 4.25. Mot. at 7, 19–23. Plaintiffs in response argue that Defendants failed to disclose the unavailability of the Cenex Tanks and Bitumar's entrance into the market, both of which allegedly materially affected the value of the Purchased Assets. Resp. at 15–16.[3]

The Court agrees with Plaintiffs. The plain text of Section 4.25, when read in conjunction with the definition of material adverse effect, for substantially the same reasons as discussed above, unambiguously applies to extrinsic events that negatively impact the value of the purchased assets. The Court therefore finds that Plaintiffs have plausibly stated a claim when they alleged that Defendants failed to disclose the situation regarding Bitumar's entrance into the market and the leasing of the Cenex Tanks.

Accordingly, the Court denies Defendants' Motion to Dismiss regarding Plaintiffs' Claims that they breached Sections 4.25 and 4.06.

---

[3] The Court acknowledges that Defendants' in their briefing have argued that Plaintiffs were aware of the unavailability of the tanks as well as the potential that Bitumar was looking at entering into the Northeast Asphalt market. Mot. at 26–27. However, at this early stage of the case, the Court is required to take Plaintiffs' plausible factual allegations as true. *Iqbal*, 556 U.S. at 678.

### B. Fraud in the Inducement

Defendants also argue that they did not fraudulently induce Plaintiffs to enter into the agreement. Mot. 28–32. The Court agrees for the reasons stated below.

"Under New York Law, a claim for fraud in the inducement requires: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff. " *Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 339 (S.D.N.Y. 2017) (quoting *Palatkevich v. Choupak*, 152 F.Supp.3d 201, 222–23 (S.D.N.Y. 2016)).

The "parole evidence rule [generally] bars the consideration of extrinsic evidence of the meaning of a complete agreement, if the terms of the agreement, considered in isolation, are clear and unambiguous." *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000) (Citing *W.W.W. Assocs., Inc. v. Giancontieri,* 566 N.E.2d 639, 642 (N.Y. 1990). However, "New York. . . permits the use of parol evidence to prove a claim of fraud in the inducement, even where the written contract contains an integration, or merger clause." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). This limited exception does not apply in cases where the merger clause "specifically addresses the very conduct complained of in the fraud allegation." *Icebox-Scoops v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 111–12 (E.D.N.Y. 2009).

Moreover, in the context of agreements negotiated between sophisticated parties, courts in New York commonly find that a merger clause, even a general one, prohibits the use of parole evidence. *See Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 622 (S.D.N.Y. 2001) (noting that a "fraud claim will not stand where [a general merger clause] was

included in a multimillion dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract.").

"The integration clause, the entire contract, and the sophistication and knowledge of the parties must be considered in order to assess the reasonableness of a party's reliance." Emergent Capital Investment Mgmt, LLC, 165 F. Supp. 2d at 622–23. (citing *Harso Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996)). Further, "[i]n evaluating justifiable reliance, the plaintiff's sophistication and expertise is a principle consideration . . . [and] the sophisticated investor . . . must show that he or she has made an independent inquiry into all available information." *Id.* (collecting cases).

Also, in the context of reasonable reliance, New York courts fail to find that plaintiffs who were sophisticated parties that participated in an arms-length transaction reasonably relied on a misrepresentation when they did not exercise their due diligence. *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997). Indeed, the Second Circuit in *Schlaifer* noted that where "the parties involved. . . are not widows or orphans [but are] 'sophisticated businessmen engaged in major transactions [who] enjoy access to critical information but fail to take advantage of the access, New York courts are particularly disinclined to entertain claims of justifiable reliance.'" *Id.* (citing *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984)).

Even when a sophisticated party fails to exercise due diligence, Courts will still find fraudulent inducement, in extraordinary circumstances, when the "Special Facts doctrine" applies. Under the Special Facts doctrine, "a duty to disclose arises where one party's superior

14

knowledge of essential facts renders a transaction without disclosure inherently unfair." *P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 301 A.D. 2d 373, 378 (1st Dep't 2003).

Plaintiffs claim they were fraudulently induced to enter into the contract when "Defendants authorized agent, FMI, repeatedly touted both the availability of the Cenex Tanks, and the ability to preclude the introduction of new competition at the Port of Rensselaer by leasing the Cenex Tanks as a 'value add' growth opportunity." Resp. at 18; Am. Compl. ¶ 63. Defendants counter, arguing that that the Court should dismiss Plaintiffs' fraudulent inducement claims because (1) the Merger Clause prohibits the introduction of parol evidence; and (2) in the alternative, that Plaintiffs did not reasonably rely on any misrepresentations. Reply at 8–13. The Court agrees with Defendants on both accounts.

Starting with the Merger Clause, Section 8.06 of the APA provides in relevant part that "[t]his agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter." Asset Purchase Agreement § 8.06. Generally speaking, Section 8.06 acts to exclude the introduction of any Parol evidence and does not speak to the specific misrepresentation at issue in Plaintiffs' fraudulent inducement claim. *See id.*

However, as both parties are sophisticated and counseled and were involved in painstaking negotiations over the representations contained in the APA, the Court finds that the Merger Clause, in this instance, although indeed general, is sufficient to bar the introduction of extrinsic evidence in the context of a fraudulent inducement claim.

Moreover, even if the Merger clause did not bar the introduction of parol evidence, the Court finds that Plaintiff did not reasonably rely[4] on the alleged misrepresentation as they failed to perform meaningful due diligence. As mentioned, *supra*, in order for a sophisticated party to successfully plead a fraudulent inducement claim, they need to have alleged that they made "an independent inquiry into all available information." *See Emergent Capital Investment Mgmt, LLC*, 165 F. Supp. 2d at 623.

Here, Plaintiffs have failed to do so. Despite being sophisticated commercial parties who performed months of due diligence, Plaintiffs, in their telling, took Defendants' representations about the availability of the Cenex tanks at face value. Resp. 16–18, 19–22. Despite being in communication with Cenex and Defendants themselves, Plaintiffs did no independent research into the alleged misrepresentation. *Id.*

Plaintiffs make two arguments in support of their "reasonable reliance" on FMIs representations: (1) that their confidentiality agreement precluded any independent research; and (2) that Defendants were in possession of 'special facts' making the application of the contract against Plaintiffs unfair as a matter of law. Resp. at 20–22. The Court finds both arguments to be without merit.

Starting with the confidentiality agreement, the Court is not persuaded that the agreement precluded the Plaintiffs from engaging in meaningful due diligence. The Court understands the agreement to only relate to the contents of the Letter of Intent, and to indeed not prohibit

---

[4] As the Parties do not discuss the accuracy of FMI's alleged misrepresentation regarding the Cenex Tanks, nor the Defendants' knowledge of its veracity, the Court will continue its assessment of Plaintiffs' fraudulent inducement claim with the fourth element: reasonable reliance.

Defendants from discussing the availability of the Cenex tanks with Cenex. *See* Dkt. No. 34, Ex. A at 4–5.

Next, the Court finds that the 'special facts' doctrine is inapplicable here. The special facts doctrine only applies in cases where the misrepresentation was based off of information that was peculiarly within the knowledge of the defendants, and that could not have been discovered by the Plaintiffs. *See P.T. Bank Central Asia*, 301 A.D.2d at 378. This is not the case here.

Plaintiffs in the Amended Complaint failed to plausibly allege that the unavailability of the Cenex Tanks and the entrance of Bitumar into the relevant market were undiscoverable by Plaintiffs. *See generally* Am. Compl; Resp. Indeed, Plaintiffs allegations suggest that they were aware of Bitumar's intention to enter the northeast asphalt market, and that Defendants had been unable to finalize a lease with Cenex. *See* Am. Compl. ¶¶ 25, 45–52.

Accordingly, for the reasons stated above, the Court grants Defendants Motion to Dismiss regarding Plaintiffs fraudulent inducements claims.

### C. Contract Modification

Defendants' final argument is that they did not breach the contract by failing to remove the Mohawk barrels because the APA was not modified. Reply at 14–15. The Court agrees for the reasons stated below.

It is axiomatic that "[m]odification by definition must come after a contract has been executed; otherwise there is nothing to modify." *Alston v. Dollar Rent a Car Sys., Inc.*, No. 96 CIV. 7531 (JSM), 1998 WL 531828, at *3 (S.D.N.Y. Aug. 24, 1998). Indeed, a "modification is an agreement to abridge or amend an enforceable contractual duty under an *existing* agreement." *Ludwig v. NYNEX Serv. Co., a wholly owned subsidiary of NYNEX Corp.*, 838 F. Supp. 769, 797 (S.D.N.Y. 1993) (emphasis added).

Under New York Law, "[c]ontract modification requires proof of each element requisite to the formation of a contract, including 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Kaplan v. Old Mut. PLC*, 526 F. App'x 70, 73 (2d Cir. 2013) (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)).

In New York, "[s]ufficient definiteness as to material terms is required . . . to 'assure that courts will not impose contractual obligations when the parties did not intend' to enter into a binding agreement." *Urquizo v. Cmty. Loan Servicing LLC*, No. 24-CV-00909 (NCM) (JAM), 2025 WL 1093073, at \*7 (E.D.N.Y. Apr. 11, 2025) (citing *Kolchins v. Evolution Markets, Inc.*, 31 N.Y.3d 100, 106, 96 N.E.3d 784 (2018)). Further, "[i]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract," or modification. *See Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 548 N.E.2d 203, 206 (1989).

Here, Plaintiffs suggest that the APA was modified and produced two writings as evidence: a February 1st text-message, and a May 19th e-mail. Resp. at 26–27. Neither communication either alone or in combination is sufficient to modify the terms of the APA.

In Plaintiffs' telling, "on January 20, 2024, three days before the Parties executed the APA, All States. . . discovered a large quantity of drums, totes, and related materials that were not among the Purchased Assets." Resp. at 9. ("Mohawk Drums"). Tony Gorman allegedly "agreed on Defendants behalf to pay for the Mohawk Drums to be removed." *Id.* He sent a text message on February 1st, 2024 confirming that the drums had been removed. *Id*. *see* also Resp. at 73. And, on May 9, 2024, All States's Counsel emailed Defendants' Counsel to confirm the modification, writing that "Tony confirmed he did agree to pay these." *Id.* at 73.

Starting with the text message, the Court agrees with Defendants that it cannot support a finding that the APA was modified. As was discussed in detail above, in order for a court to find that a contract to be modified, there must be a contract. *See Alston*, 1998 WL 531828, at *3. Here, Tony Gorman sent the text-message allegedly confirming his oral agreement on February 1st, 2024, the day before the parties signed the APA. *See* Resp. at 72. At the point the text message was sent, as well as the point at which any verbal agreement was made, the parties had not mutually assented and did not have a contract. *See* Am. Compl. ¶ 73. Therefore, the February 1st, 2024 text message does not support a finding that the APA was modified.

Second, the May e-mail does not provide sufficient terms to demonstrate that the parties had a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Kaplan*, 526 F. App'x at 72. The May e-mail, standing alone, does not include any material terms at all. *See generally* Resp. at 73. In it Tony Gorman's Counsel only states that "Tony confirmed he did agree to pay these." Resp. at 73. The e-mail only provides support for the fact that some agreement may have been reached but does not meet the requisite elements for contract modification in New York State.

Accordingly, for the reasons stated above, the Court grants Defendants' Motion to Dismiss on Plaintiffs' Claims that they breached the contract by failing to remove the Mohawk barrels.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Dismiss, Dkt. No. 33, is **GRANTED** in part and **DENIED** in part and it is further;

19

**ORDERED,** that Defendants' Motion to Dismiss on Plaintiffs' claims of false representation and failure to disclose is **DENIED**, and it is further,

**ORDERED,** that Defendants' Motion to Dismiss on Plaintiffs' claims of fraud in the inducement and failure to perform, is **GRANTED**, and it is further,

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 31, 2026
            Albany, New York

LAWRENCE E. KAHN
United States District Judge